UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Reginald A.,[1] | ) C/A No. 5:22-2794-KDW |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ORDER |
| | ) |
| Martin O'Malley,[2] Commissioner of Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.     Relevant Background

    A.     Procedural History

On April 1, 2020,[3] Plaintiff filed an application for DIB under Title II of the Act, alleging

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.
[2] Martin O'Malley was confirmed as Social Security Commissioner on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Martin O'Malley for Kilolo Kijakazi as Defendant in this action.
[3] Although the Application Summary is dated April 28, 2020, Tr. 167, based on the Disability Determination and Transmittal, Plaintiff's filing date was April 1, 2020, Tr. 68.

a disability onset date of January 9, 2020. Tr. 167-70. Plaintiff's application was denied initially, Tr. 68, and upon reconsideration, Tr. 87. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 101-02. The administrative hearing was held on November 9, 2021. Tr. 26-56. On December 9, 2021, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act. Tr. 13-21. Plaintiff requested review of the ALJ's decision. Tr. 164-66. After granting Plaintiff's request for an extension, Tr. 8-9, on July 19, 2022, the Appeals Council denied Plaintiff's request for review, Tr. 1-6. Thus, the ALJ's decision became the final decision of the Commissioner. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on August 22, 2022. ECF No. 1.

B.      Plaintiff's Background

Plaintiff was born in March 1958 and was 62 years old on his alleged onset date of January 9, 2020. Tr. 185. In his April 28, 2020 Disability Report-Adult form Plaintiff indicated that he completed four or more years of college in 1980, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 190. Plaintiff listed his past relevant work ("PRW") as insurance claims adjuster for an auto insurance company from July 1995 until January 9, 2020. *Id.* Plaintiff indicated that he stopped working because of his medical conditions and because he retired from his job. Tr. 189. Plaintiff listed his medical conditions as "L4/L5 disc fusion surgery, lower back condition, both leg pain/numbness, limited flexibility, can't walk a lot due to pain, difficult getting up and down, unable to sleep due to pain, heart condition, a-fib."[4] *Id.* Plaintiff indicated his height as 6'3" and weight as 287 pounds. *Id.* He also indicated that his conditions caused pain or other symptoms. *Id.*

---

[4] "Atrial fibrillation (AFib) is an irregular and often very rapid heart rhythm. An irregular heart rhythm is called an arrhythmia. AFib can lead to blood clots in the heart. The condition also increases the risk of stroke, heart failure and other heart-related complications."

2

C.  The Administrative Proceedings

Plaintiff's administrative hearing took place on November 9, 2021 in Greenville, South Carolina before ALJ J. Petri. Tr. 26. Plaintiff was present, along with his attorney, and Vocational Expert ("VE") Ted Sawyer. *Id.* The hearing was conducted telephonically due to the Covid pandemic. Tr. 28-29.

1.  Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified that he completed four years of college with a bachelor's degree in "Counselor, education and minor in psychology." Tr. 31. Plaintiff stated that he is 6'3" tall, weighed "about 270" pounds, and is right-handed. Tr. 31-32. Plaintiff testified that he is married, lives with his wife, and receives social security retirement. Tr. 32. Plaintiff stated that he "had a work comp claim" when he was hurt on the job in 2010. *Id.* Plaintiff testified that he has a driver's license but needs to take breaks if he has to drive over 45 minutes to an hour. Tr. 32-33. When asked when he stopped working Plaintiff stated he thought it was in 2019, but upon prompting from the ALJ agreed that it was January 9, 2020. Tr. 33. Plaintiff testified that he stopped working because he "couldn't perform anymore." *Id.* He stated that he could not do the job anymore without pain and he was having difficulty focusing at work. *Id.* Plaintiff stated that he worked as a field adjuster and that entailed climbing ladders or crawling under homes for inspection and traveling in a vehicle. Tr. 34. Plaintiff testified that his "leg would go numb" and he was having issues climbing ladders or being on top of roofs. *Id.* Plaintiff stated that he was "regulated to a desk job" but later that was painful. *Id.* He testified that he became anxious and had sleepless nights, would fall asleep at his desk, and took some medications that made him want to sleep. *Id.* Plaintiff testified that he worked a desk job for five years and he "tried

---

https://www.mayoclinic.org/diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624 (last visited Jan. 16, 2024).

3

to suffer through it because [he] wanted to make it to [his] retirement . . . the full amount." *Id.* Plaintiff testified that in his desk job he was on the phone, handling calls, investigating claims, discussing injury settlements, and "a lot of computer work." Tr. 34-35.

The ALJ noted that Plaintiff's medication list did not include pain medication and asked what Plaintiff was doing for his pain. Tr. 35. Plaintiff testified that he took Ibuprofen and Aleve, and sometimes Gabapentin, but he did not want to get "hooked on" serious pain medication. *Id.* Plaintiff stated that to relieve pain he tried to "get up when necessary," and by standing, sitting, or lying down. *Id.* When asked if he had any special mental health treatment or counseling Plaintiff testified that he just talked with his doctor and he takes Atenolol which "kind of helps with that." *Id.* Plaintiff testified that after his surgery he began to have atrial fibrillation and atrial flutter. Tr. 35-36. Plaintiff stated he had "issues with controlling the heart rate" and that caused him to have heart ablation surgery. Tr. 36. Plaintiff stated he was trying to avoid having open heart surgery, so he tries not to get too stressed or anxious. *Id.* Plaintiff confirmed that he was currently seeing only his family doctor and had an appointment in "a few weeks." *Id.*

In response to questions from his attorney Plaintiff testified that although his current weight was stable at 270 pounds, in 2019 and 2020 his weight kept fluctuating because he was not physically active and he put on weight. Tr. 36-37. Plaintiff testified that his doctor has encouraged him to lose weight. Tr. 37. Plaintiff stated that he thought doctors recommended he lose weight to help with his heart rate issues, blood pressure, and diabetes. Tr. 37-38. Plaintiff stated that he did not have anxiety prior to his lumbar spine surgery. Tr. 38. Plaintiff was unable to remember when he started taking Lorazepam but noted his anxiety became worse "with the pain and not being able to perform the job." *Id.* Plaintiff confirmed that his anxiety would impact his ability to return to work. *Id.* Plaintiff testified that he was having issues with stress-induced anxiety when he was

4

working in 2020. He stated that his blood pressure would go up, it was hard to focus, and he would have to take breaks from his workstation. Tr. 39-40. He testified that "management was noticing" and his performance reviews were not as good as they were in the past. Tr. 40. Plaintiff testified that he was having trouble keeping up with the work and would bring work home. Tr. 40-41.

 Plaintiff testified that he still has pain in his lower back that radiates down his leg, and he has right heel pain. Tr. 41. He stated that his leg is "constantly sore and numb." *Id.* He described the pain as "like stabbing, your leg is on fire." *Id.* Plaintiff indicated that his pain was in his right leg. *Id.* Plaintiff testified that when he was released from care by the neurosurgeon, he was given a lifting restriction of 15-20 pounds and told not to lift anything heavy or strain. *Id.* Plaintiff stated that he can sit in a chair for about 45 minutes to an hour, stand for about 40 minutes before needing to sit, and he could walk "maybe a half a football field, something like that." Tr. 42. Plaintiff stated that he tries not to lift more than 15-20 pounds. *Id.* Plaintiff testified that he takes Atenolol for his atrial fibrillation. *Id.* Plaintiff testified that in stressful situations he becomes anxious, his heart rate increases, and it is hard to breathe. Tr. 43. He testified that he tries "not to be stressed or too anxious. And it gets better." *Id.* Plaintiff confirmed that he was having difficulty sleeping and, when he was working, he was caught falling asleep at his desk. *Id.* Counsel noted that Plaintiff was taking medication for insomnia and Plaintiff testified that even with the medication he was having trouble sleeping because "the pain fights through that" and would wake him up. *Id.* Plaintiff testified that he gets three or four hours of sleep at night and would unintentionally fall asleep during the day, but then he would have to get up because of the pain in his legs. Tr. 44. Plaintiff testified that on a typical day he watches TV, and he will go to feed and walk his mother's dog and visit with family. *Id.* Plaintiff stated that it has been years since he has been able to have "physical fun" such as playing basketball and tennis. *Id.* Plaintiff testified that his wife is still working full-

time, and while she is at work he tries to do some household chores like "Swiffer broom for a short period and maybe vacuum one room or something like that." Tr. 45. Plaintiff stated that he can ride the riding lawnmower for 35-40 minutes to cut the grass, and he does some "weedeating" but then will have to lie down. *Id.* Plaintiff testified that he does "manual chores" because he cannot afford to pay anyone to do it. *Id.* Plaintiff testified that he visits with his three grandchildren who live locally. *Id.*

Plaintiff testified that since his back surgery the pain has gotten better such that he can stand longer than he could before the surgery, but he stated that he "still can't stand for long periods of time or do any activities for a long period of time" or "jog anymore like [he] used to[.]" Tr. 46. Plaintiff confirmed that he has pain on a daily basis, and it is "a little depressing" and he is "a little embarrassed" that his wife is still working and he is not working. *Id.* Plaintiff stated that he is not able to function like he used to, and he tries not to think about it to the point that it overwhelms him, but it bothers him mentally. Tr. 46-47.

2. VE's Testimony

The VE asked for clarification regarding Plaintiff's move from an outside adjuster to working inside and asked if that was an accommodation or a different position. Tr. 48. Plaintiff testified that it was an accommodation for him because of his difficulties in doing field work, and doctors recommended it because of the liability and exposure related to him being on roofs. *Id.* Plaintiff's attorney noted that the job "ended as soon as he lost the protection of his workers' compensation claim—which ended in early 2019." *Id.*

The VE identified Plaintiff's past work as claim adjuster, Dictionary of Occupational Titles ("DOT") number 241.217-010, light as normally performed, and skilled with SVP of 6. Tr. 48-49. The ALJ asked about the desk job and the VE testified that based on Plaintiff's testimony it

6

appeared to be an accommodation and not a separate occupation. Tr. 49. The ALJ asked Plaintiff if there were others doing the same job that he did when he was sitting doing the desk job, and Plaintiff testified that there were other jobs held by people who did not start out as a field adjuster. *Id.* Plaintiff testified that his position changed from "property field rep to an auto rep" and his salary was affected because he no longer had a company car and had to buy a car. Tr. 49-50. The VE indicated if he considered the position as a separate occupation it would be classified as claim examiner, DOT number 241.267-018, sedentary as normally performed, and skilled with SVP of 7. Tr. 50. Plaintiff interjected that there would be times he would have to go out to take pictures of an accident scene as part of the investigation. *Id.* Plaintiff testified that would happen once or twice a week. Tr. 51.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work with the following limitations:

> Hypothetical number one is light work, except this hypothetical individual could never climb. He could occasionally stoop, kneel, crouch, or crawl. He can have frequent exposure to workplace hazards. And he would require the opportunity to alternate sitting and standing, and that's going to be at will, with less than ten percent off task during change in position.

*Id.* The ALJ asked if the individual could do either of the past jobs. *Id.* The VE testified that the essential functions of the job "do not give an individual absolute discretion as to the postural position" so because the essential functions of the jobs were "somewhat rigid" he excluded the past work. Tr. 52.

The ALJ asked if hypothetical two was without the sit/stand, could he do the past work, and the ALJ defined workplace hazards as the use of moving machinery and exposure to unprotected heights. Tr. 52. The VE testified that "based on the analysis of the DOT, this work, past work could be performed." *Id.* The VE affirmed that was for both jobs. *Id.*

For hypothetical number three the ALJ added to the limitations in hypothetical number two that the individual would be limited to simple, routine tasks performed two hours at a time. Tr. 53. The VE opined that would eliminate past work. *Id.* The VE affirmed his testimony was consistent with the DOT and companion publications. *Id.*

Plaintiff's counsel asked the VE what the impact would be on the individual's ability to return to past relevant work if he was limited to the ability to understand, remember, and comprehend detailed instructions, but not complex instructions. Tr. 53. The VE testified that based on the way counsel posed his hypothesis, past work would be eliminated. Tr. 53-54. Counsel asked if competitive employment would be compatible if the individual was incapable of sitting, standing, and walking for a combination of "8 hours a day, 5 days a week, for a 40-hour work week," and the VE confirmed it would not be compatible. Tr. 54.

Plaintiff's counsel asked if there is a "general percentage during the course of a working day where an employer is going to accommodate time off task?" Tr. 54. The VE testified that "based on the studies [he] reviewed and [his] own experience, training, and education, employers will typically tolerate a range of off task of up to ten percent of the workday. Beyond ten percent . . . is typically work preclusive." *Id.* The VE confirmed that if an individual were to exceed ten percent off task, they would be unemployable. *Id.* Counsel asked what the customary number of absences is that employers tolerate on a monthly basis. *Id.* The VE responded that based on his experience, "employers will typically tolerate absenteeism up to two days per month. But consistently absent two or more days per month would lead to termination." Tr. 55.

With no further questions, the hearing concluded. Tr. 55-56.

II.     Discussion

    A.     The ALJ's Findings

8

In her December 9, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.

2. The claimant has not engaged in substantial gainful activity since January 9, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine post fusion and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb. He can occasionally stoop, kneel, crouch and crawl. He can have frequent exposure to workplace hazards.

6. The claimant is capable of performing past relevant work as a claim adjuster and claim examiner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 9, 2020, through the date of this decision (20 CFR 404.1520(f)).

Tr. 15, 17, 21.

    B.    Legal Framework

        1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

9

      death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See*

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather,

the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    C.    Analysis

Plaintiff argues: (1) the ALJ failed to consider all relevant medical evidence, and (2) the ALJ erred in determining that Plaintiff did not have a severe impairment of atrial fibrillation. Pl.'s Br. 3-4, ECF No. 9.

    1.    ALJ's Consideration of the Evidence

Plaintiff argues that the ALJ failed to consider the records from "Plaintiff's former orthopedic spine specialist, Dr. Marco Rodriguez, and his practice Orthopedic Specialties." Pl.'s Br. 3. Plaintiff argues this failure is "especially egregious in the instant case because these records documented that Plaintiff was first treated for his lumbar spine issues as far back as February 2011." *Id.* at 4. The Commissioner argues that substantial evidence supports the ALJ's

12

consideration of the entire record, and Plaintiff fails to demonstrate how consideration of these records would compel a different finding. Def.'s Br. 12-13, ECF No. 10.

### a. Dr. Marco Rodriguez Office Treatment Records

Plaintiff was seen by Dr. Rodriguez on January 14, 2011 complaining of back pain and radicular leg pain after pulling a ladder out of the back seat of his car. Tr. 464. X-rays of his lumbar spine revealed no instability or loss of disc height other than degenerative disc at L5/S1. Tr. 465. An MRI was ordered, Plaintiff was started on physical therapy, and advised that "there is no need for bed rest at this time." *Id.* An MRI of Plaintiff's lumbar spine was performed on February 4, 2011. Tr. 466-67. The impression was "Small central L5-S1 disc protrusion with grade 1 retrolisthesis contributing to mild central spinal canal and mild bilateral neuroforaminal stenosis. 2. Small central L3-L4 disc extrusion with moderate bilateral neuroforaminal stenosis." *Id.*

Plaintiff returned to Dr. Rodriguez on March 4, 2011 and he assessed Plaintiff with L3/4 spondylolisthesis with stenosis and L5/S1 vertical collapse and herniated nucleus pulposus. Tr. 462. Plaintiff was advised to continue taking Mobic and continue with physical therapy, and Dr. Rodriguez ordered a "right sided L3/4 selective nerve root block," that would be canceled if Plaintiff felt better in the next week. *Id.* Plaintiff was given work restrictions of lifting no more than 10 pounds. Tr. 463. Plaintiff was again advised there was no need for bed rest. *Id.*

At his April 15, 2011 appointment, Plaintiff advised that he did not have the injections due to a scheduling issue, but stated he wanted to "hold off on them right now." Tr. 460. Plaintiff was continued on Mobic and given some Tramadol for breakthrough pain. *Id.* Plaintiff stated that "it just bothers him when he is standing on hard cement for any length of time." *Id.* Plaintiff returned to Dr. Rodriguez on October 18, 2011, and stated had not been taking any significant medication and was "dealing with the pain." Tr. 458. Dr. Rodriguez noted that he had Plaintiff on "limited

duty, no climbing ladders or lifting" but he was going to try to get him back to normal work duty. *Id.*

Plaintiff returned for a "recheck exam" on March 5, 2012 and reported that the pain was better he was "still having some pain in the right low back and right anterior thigh. He states it has improved." Tr. 456. Plaintiff was instructed to return on an as needed basis. Tr. 457. A year later, on April 17, 2013, Dr. Rodriguez provided an impairment rating for Plaintiff. Tr. 455. Dr. Rodriguez indicated that he would "go along with the [L3-L4] spondylolisthesis diagnosis only" but not the L5-S1 herniated disc diagnosis. *Id.* He placed Plaintiff at "11 percent lumbar spine impairment and 11 percent overall body impairment" and noted that Plaintiff was "stabilized" but may need surgery at some point in the future. *Id.*

Plaintiff returned for a "recheck exam" on October 23, 2013. Tr. 453. The treatment note indicated Plaintiff had not been seen "in years" and cited to his original worker's compensation injury when he was getting a ladder out of his car. *Id.* Plaintiff reported that he continued to have low back pain and right L4-L5 pain when he stands for any length of time, but that the pain was better if he sits. *Id.* Plaintiff reported the pain had become more severe, and he was still working at his same job. *Id.* Plaintiff was prescribed Mobic and Tramadol for pain and it was noted that he was not taking anything at that time. Tr. 454. Plaintiff was advised that if the medications were ineffective, he may consider trying an epidural steroid injection, and if it "gets to the point where he needs surgical intervention" then Dr. Rodriguez would reassess. *Id.*

Plaintiff was next seen on February 4, 2015 for worsening pain in his anterior thigh and right leg that was "mostly at night when he goes to bed." Tr. 451. Plaintiff reported that "[d]uring the day he has been able to get around pretty well, just by doing a sedentary job." *Id.* He stated that his back and leg "bothers him from time to time" and he has had episodes where his right leg

buckles, but this is not a constant problem. *Id.* Plaintiff indicated that he wanted to "continue to live with this" and Dr. Rodriguez advised that if the pain worsened, he could discuss options of steroid injections or a L3-L4 fusion. Tr. 452.

      b. Discussion

The regulations in effect at the time Plaintiff filed his claim define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 404.1513(a)(3).

Dr. Rodriguez' office treatment records are from seven office visits between January 2011 and February 2015. Tr. 450-67. As noted by the Commissioner, this was "a time period in which [Plaintiff] continued to work and which pre-dated his 2017 lumbar fusion." Def.'s Br. 12. Based on Dr. Rodriguez's records, and the regulation defining medical opinions, arguably the only opinions offered by Dr. Rodriguez were the 2011 restrictions on lifting or climbing ladders. Tr. 458, 463. Dr. Rodriguez's remaining treatment notes do not offer any opinions and would be considered "other medical evidence."

Although the ALJ indicates in her decision that she considered "the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c[,]" Tr. 17, nowhere in her decision does she articulate her consideration of Dr. Rodriguez's treatment records or the persuasiveness of those records. The regulations require that

15

all medical opinions in a claimant's case record be considered. 20 C.F.R. 404.1520c(b) ("We will articulate in our determination or decision how persuasive we find *all of the medical opinions* and all of the prior administrative medical findings in your case record.") (emphasis added). Accordingly, the court agrees that the ALJ erred in failing to consider Dr. Rodriguez's opinions. However, the court finds this error to be harmless. "An ALJ's failure to note a treating physician's opinion may constitute 'harmless error' when the opinion is 'not relevant' to the claimed period of disability." *Faust v. Colvin*, No. 5:13-CV-364-FL, 2014 WL 4636988, at *5 (E.D.N.C. Sept. 16, 2014). Additionally, Plaintiff has the burden to show that his impairments were so functionally limiting that they would preclude him from performing any substantial gainful activities for at least twelve consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 219-20 (2002); *Payne v. Sullivan*, 946 F.2d 1081, 1082 (4th Cir. 1991) ("The federal regulations dealing with social security benefits provide that if a claimant is 'able to engage in substantial gainful activity,' he will be found to be not disabled."). Plaintiff argues that if the ALJ had considered Dr. Rodriguez's opinions, her RFC "could have been different and resulted in a no jobs scenario." Pl.'s Reply at 3, ECF. No. 11. This is an illogical supposition, given that during the period that Dr. Rodriguez provided limitations on Plaintiff's functionality, Plaintiff continued to work full-time. Indeed, after his final opinion in 2011 that provided functional limitations, Plaintiff worked an additional nine years.

Furthermore, Dr. Rodriguez's records not only pre-dated Plaintiff's alleged disability onset date, but the records also pre-dated Plaintiff's 2017 lumbar fusion surgery. Dr. Rodriguez last saw Plaintiff in February 2015 and at that time he told Plaintiff that "long term the only way to really fix this problem is to fuse the L3-L4 level." Tr. 452. In her decision the ALJ noted that "the longitudinal record notes significant postsurgical improvement." Tr. 19. She cited to a treatment

16

record from the surgeon dated August 7, 2018 in which Plaintiff had his one-year post-op follow-up exam and "reported that his symptoms have 95% resolved." *Id.* The ALJ also cited to a September 12, 2020 consultative orthopedic exam wherein the examining physician indicated that Plaintiff could perform light duty work. Tr. 20. The ALJ noted that because of Plaintiff's alleged back pain she limited him to less than a full range of light work with additional postural restrictions. Tr. 18. These restrictions included that he never climb, and he could only occasionally stoop, kneel, crouch and crawl. Tr. 17. Except for the two-year period where Dr. Rodriguez limited Plaintiff to lifting less than ten pounds, these restrictions go even further than the restrictions of Dr. Rodriguez. The ALJ also cited to Plaintiff's hearing testimony where he stated that his doctor recommended that he not lift over 20 pounds. Tr. 18. This is consistent with the ALJ's RFC limitation to work at the light level which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Notably, the ALJ also determined Plaintiff could return to his PRW as a claim examiner which is defined in the DOT as sedentary work. Tr. 21. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Accordingly, the court finds that the ALJ's failure to consider the opinions of Dr. Rodriguez is harmless error because it would not have changed the ALJ's RFC assessment or disability determination.[6] *Pierce v. Berryhill*, 2018 WL 1940417, at *4 (M.D.N.C. Apr. 23, 2018), *report and recommendation adopted*, 2018 WL 3549842 (M.D.N.C. June 12, 2018) (finding ALJ

---

[6] *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of Social Security benefits where the ALJ erred in pain evaluation because "he would have reached the same result notwithstanding his initial error); *see also Ward v. Comm'r of Soc. Sec.,* 211 F.3d 652, 656 (1st Cir. 2000) (holding that a remand is not necessary if it would "amount to no more than an empty exercise"); *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

did not err when ALJ did not consider records predating relevant period and Plaintiff did not show how they would have changed the outcome).

2. ALJ's Consideration of Non-Severe Impairment

Plaintiff argues the ALJ erred by failing to determine he had the severe impairment of atrial fibrillation. Pl.'s Br. 4. The Commissioner asserts that there was no error because the ALJ "proceeded past step two and addressed Plaintiff's mild cardiac symptoms in the RFC evaluation (Tr. 18)." Def.'s Br. 15.

Step Two is a threshold determination of whether a claimant has a severe impairment (or combination of impairments) that meets the twelve-month duration requirement and significantly limits the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms[.]" 20 C.F.R. § 404.1508. Conversely, if an impairment is a slight abnormality or a combination of slight abnormalities that causes no more than a minimal effect on an individual's ability to do basic work activities it is considered to be non-severe. SSR 85-28, 1985 WL 56856 at *3; 20 C.F.R. § 404.1522(a). The regulation provides examples of basic work activities that include:

>  (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>  (2) capacities for seeing, hearing, and speaking;
>  (3) understanding, carrying out, and remembering simple instructions;
>  (4) use of judgment;

>   (5) responding appropriately to supervision, co-workers and usual work situations; and
>   (6) dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b). It is the claimant's burden to prove that he suffers from a medically severe impairment. *Bowen v. Yuckert*, 482 U.S. at 146 n.5.

Here, at Step Two the ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine post fusion and obesity. Tr. 15. Regarding Plaintiff's atrial fibrillation the ALJ found:

> The record also notes a diagnosis of atrial fibrillation (Exhibit 5F); however, there is no indication in the record that his impairment causes more than minimal limitations in the claimant's ability to perform basic work activities. Cardiology reports indicate the claimant's atrial fibrillation caused only mild symptoms initially. However, follow-up records note no reported recurrent symptoms (Exhibit 5F). Accordingly, I find this to be a nonsevere impairment.

Tr. 18.[7]

In order to prevail on his argument, Plaintiff must demonstrate that the alleged disorder significantly limited his ability to perform basic work activities, which he has not done. *See* 20 C.F.R. § 404.1522; *Bowen v. Yuckert*, 482 U.S. at 146. While Plaintiff cites to his 2017 atrial flutter ablation, his testimony regarding ongoing symptomology, and the fact that he continues to take medication for this impairment, Plaintiff does not cite to any medical record that declares that the severity of his atrial fibrillation impacts his ability to perform basic work activities.

However, even if the ALJ erred in finding any of Plaintiff's alleged impairments are not severe, any such error was harmless. "As long as a claim is not denied at step two, it is generally unnecessary for the ALJ to have specifically found any additional alleged impairment to be severe." *Bryant v. Comm'r, Soc. Sec. Admin.*, No. 2:15-CV-4786-RMG-MGB, 2017 WL 394500,

---

[7] The ALJ also found Plaintiff's mental impairments of depression and anxiety to be nonsevere. Tr. 15.

at *9 (D.S.C. Jan. 10, 2017), *report and recommendation adopted sub nom. Bryant v. Colvin*, No. CV 2:15-4786-RMG, 2017 WL 384302 (D.S.C. Jan. 25, 2017)). *See also Martinez v. Astrue*, No. CA 1:11-850-CMC-SVH, 2012 WL 3580675, at *10 (D.S.C. July 30, 2012), *report and recommendation adopted,* No. CA 1:11-850-CMC-SVH, 2012 WL 3582799 (D.S.C. Aug. 17, 2012) ("A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three."). In other words, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." *McClain v. Colvin*, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted). Here, the ALJ found Plaintiff had severe impairments and proceeded to the next step of the sequential evaluation process. Accordingly, any allegation of error in this regard is harmless.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported by substantial evidence. Based on the foregoing, the undersigned finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

January 23, 2024                                    Kaymani D. West
Florence, South Carolina                      United States Magistrate Judge